THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RYAN LORD, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | No. 22 C 2689 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| ) | |
| JONATHAN LEO SMITH, ) | |
| ) | |
| *Defendant*. ) | |

**MEMORANDUM OPINION & ORDER**

Ryan Lord and Johnathan Leo Smith are both well-known professional creators of on-line game gamers who have millions of followers on social media. Plaintiff Ryan Lord sued Defendant Jonathan Leo Smith for posting allegations of sexual misconduct about Lord on social media and messaging others to harm him at his home address. (Dkt. 1). Lord claims Smith's statements portrayed him in a false light, defamed him, interfered with his business prospects, and intentionally caused him severe emotional distress. (*Id.*) Smith moves to dismiss for lack of personal jurisdiction and improper venue, or in the alternative, to transfer to the Eastern District of North Carolina. (Dkt. 7). For the following reasons, Smith's Motion to Dismiss for lack of personal jurisdiction or improper venue, or to transfer to the Eastern District of North Carolina, is denied. [7]

**BACKGROUND**

On a Rule 12(b)(2) Motion to Dismiss, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and resolve[s] any factual disputes in the affidavits in favor of the plaintiff." *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

1

Plaintiff Ryan Lord, known professionally as Ohmwrecker, is a citizen and resident of Illinois. (Dkt. 1 ¶¶ 2, 9). Defendant Jonathan Smith, known professionally as H20 Delirious, is a citizen and resident of North Carolina. (*Id.* ¶¶ 3, 14). Both are professional creators of online video game streaming content, broadcast on such streaming platforms as YouTube and Twitch. (*Id.* ¶¶ 7–19). They each have millions of subscribers and social-media followers from the online gaming community around the world. (*Id.* ¶¶ 10–11, 16–17).

Lord heard allegations that Smith had had sexual contact with a minor and that he had released revenge porn against a different adult sexual partner. (*Id.* ¶¶ 20–23). Lord discussed these allegations with some mutual friends. (*Id.* ¶ 23). When Smith heard Lord had been talking about him, Smith contacted Lord to deny the allegations. (*Id.* ¶¶ 24–25). Lord thought Smith was lying and blocked him on social media. (*Id.* ¶ 25).

Smith then created Twitter profiles under false names in a campaign to allegedly harass and defame Lord/Ohmwrecker within the online gaming community. (*Id.* ¶¶ 26–30). For example, on May 16, 2021, Twitter user Ryan8399330784—alleged to be Smith—threatened to expose a compromising video of Lord and a woman from sixteen years earlier. (*Id.* ¶ 29). And on May 17, 2021, Twitter user Hopper981—also alleged to be Smith—sent direct messages to Lord's Twitter followers the following statement: "He has a released sex tape that he made long ago. He received so much hate from [sic] and phone calls because they said she was underage. He is not a good person." (*Id.* ¶ 30). Lord discussed the allegations against Smith in an interview on the YouTube channel DramaAlert. (*Id.* ¶ 31). Smith then posted about Lord publicly on Smith's main Twitter account. (*Id.* ¶¶ 31–34, 38–39). About a month later, Twitter user Ohmlied, later renamed to DMme4Truth—both aliases Smith used—posted statements about Lord having sexual contact with a minor. (*Id.* ¶ 40).

Lord sent Smith a cease-and-desist letter, demanding Smith stop making false statements about him and retract his previous statements, including those made under false names. (*Id.* ¶¶ 41–45). But Smith continued posting publicly about Lord from alternative Twitter accounts. (*Id.* ¶¶ 46–48, 50). Collectively, the posts falsely accused Lord of "1) having committed blackmail, 2) releasing revenge porn, 3) having sexual relations with a minor, 4) uploading a sex tape with a minor, 5) having police reports against [him] for stalking, and 6) stalking [Smith]." (*Id.* ¶ 52). Twitter investigated and suspended several of the profiles from which these statements were made and confirmed Smith created them. (*Id.* ¶¶ 55–56). Twitter user Delirious_not—alleged to be Smith—posted afterward: "Oh [Defendant] was only banned because he was showing people your past. ;) but you the internet Karen reported him because you don't want people knowing your own past of being a racist talking in pedo chats on old forums and releasing a sex tape when someone wouldn't talk to you." (Dkt. 1 ¶ 62). Smith also engaged his girlfriend[1]—who also has a large social media following—in making similar false statements about Lord. (*Id.* ¶¶ 57–59). Smith publicly commented as himself on another YouTube channel's livestream about the existence of a sex tape of Lord and police reports of Lord for stalking. (*Id.* ¶¶ 60–61).

Smith made nearly all statements about Lord/Ohmwrecker as public postings on social media platforms, either as himself or under alternate accounts. (*Id.* ¶¶ 29, 32–34, 38, 40, 46–48, 60, 62; *see also* dkt. 15-1 ¶¶ 10–12). Postings on Smith's main Twitter account reached his 4.4 million followers. (Dkt. 1 ¶ 32). Smith also sent emails to several popular YouTube drama channels from the account stormsusan455@yahoo.com. (*Id.* ¶ 49). He direct messaged and emailed some of Lord's online followers and friends, though Lord does not identify who received

---

[1] Smith's girlfriend is also a citizen and resident of North Carolina. (Dkt. 9 ¶ 5).

these direct messages and emails, nor where they reside. (*Id.* ¶¶ 30, 50; Dkt. 15-1 ¶ 13; *see also id.* ¶ 16).

Smith outed Ohmwrecker as Ryan Lord and posted Lord's real photo, date of birth, and Illinois home address in public posts and direct messages. (Dkt. 1 ¶ 138; dkt. 15-1 ¶ 21; dkt. 35 at 6–8). At least some of his posts encouraged his followers—known as the "Delirious Army"—to threaten Lord with violence. (Dkt. 1 ¶ 138; dkt. 35 at 6–8). Smith also revealed the real name of Lord's girlfriend in at least one of his posts.[2] (Dkt. 35 at 8–9). Lord received threats of violence against himself, his dog, and his girlfriend. (Dkt. 1 ¶¶ 69, 139). Smith also "actively searched for and made contact with an ex-girlfriend of [Lord] from seventeen years ago regarding the false allegations of releasing revenge porn and having sexual intercourse in the released video with a minor. [Lord's] ex-girlfriend is a lifelong resident of Illinois." (Dkt. 15-1 ¶ 15). Smith has direct messaged and emailed Lord with false statements and "other distressing statements such as 'you have no life,' and calling [him] 'worthless' and 'pathetic human trash.'" (*Id.* ¶¶ 11, 14). Some of the allegations Smith made about Lord involve another Illinois resident, and the statements about police reports suggest Smith "was engaging Illinois law enforcement agencies." (*Id.* ¶¶ 17–18).

Lord lost followers, sponsors, collaboration opportunities with other streamers, viewership, and income. (*Id.* ¶¶ 65–68). He suffered "embarrassment, humiliation, mental anguish, and severe emotional distress" from Smith's conduct. (*Id.* ¶ 64).

Smith, however, has never resided in or physically entered Illinois. (Dkt. 9 ¶ 4). He owns no real estate, businesses, or other assets here, and he works from his home in North Carolina. (*Id.*) Smith wrote and published all social media posts, messages, and emails while in North Carolina,

---

[2] Lord's girlfriend is also alleged to live in Illinois. (Dkt. 35 at 8–9).

4

not Illinois. (*Id.* ¶ 3). His public, interactive YouTube channel and other social media profiles are viewable anywhere with an internet connection. (*Id.* ¶ 4).

Lord brings Illinois state-law claims against Smith for false light, defamation per se, defamation, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. (Dkt. 1 ¶¶ 71–153). Smith now moves to dismiss for lack of personal jurisdiction and improper venue, or in the alternative, to transfer venue to the Eastern District of North Carolina. (Dkts. 7, 8).

### LEGAL STANDARD

The plaintiff bears the burden of proving personal jurisdiction when challenged. *John Crane, Inc. v. Shein L. Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018) (citing *Northern Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014)). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Rrch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003). Where, as here, there has been no jurisdictional hearing, the plaintiff need only set forth a prima facie showing of jurisdiction. *Id.* The Court reads "the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff to decide whether a prima facie case for personal jurisdiction exists. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reins. Co.*, 440 F.3d 870, 877–78 (7th Cir. 2006).

### DISCUSSION

**A.  Personal Jurisdiction**

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Daimler AG v. Bauman*, 571

5

U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A))). Illinois's long-arm statute grants jurisdiction over nonresidents coextensive with the federal standard for due process. 735 ILCS 5/2-209(c); *John Crane, Inc.*, 891 F.3d at 695. Federal due process "constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden*, 571 U.S. at 283 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). For this Court to exercise personal jurisdiction, a nonresident defendant must have "minimum contacts" with Illinois "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted).

Personal jurisdiction may be general or specific. The parties agree this Court does not have general personal jurisdiction over Smith, who is domiciled in North Carolina, has never set foot in Illinois, and has no regular business in Illinois. (Dkt. 9 ¶ 4). Lord instead claims Smith's conduct established sufficient minimum contacts with Illinois to support specific personal jurisdiction. (Dkt. 15 at 4).

Specific, or "case-linked," jurisdiction exists when three requirements are met:

> First, the defendant's contacts with the forum state must show that it "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities in the state." Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."

*Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (quoting *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012)).

The Court begins with whether Smith "purposefully directed [his] activities at" Illinois. To answer this question in the intentional-torts context, the Seventh Circuit has distilled from the Supreme Court's guidance in *Calder v. Jones* three criteria: "(1) intentional conduct (or

'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Felland*, 682 F.3d 665, 674–75 (7th Cir. 2012) (citing *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)).

The Supreme Court clarified in *Walden v. Fiore* that the test for purposeful direction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283–84 (internal quotations omitted). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 284. The *Walden* Court emphasized that this relationship "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The Court's analysis is "defendant-focused," and contacts between the plaintiff (or third parties) and the forum state—without more—do not satisfy due process. *Id.*; *see also id.* at 286 ("[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.").

Here, Smith allegedly defamed and portrayed Lord in a false light across interactive social media platforms. (Dkt. 15-1 ¶¶ 4, 7). Smith also defamed Lord in direct messages to Lord's online followers, some of whom may be in Illinois, but whose whereabouts are essentially unknown. (*See* dkt. 15-1 ¶ 16). Smith's defamatory campaign against Lord was diffused across the global online gaming community. (*See* dkt. 1 ¶ 15 ("Defendant has millions of fans and followers also around the world who follow his work and his social media profiles."); *see also id.* ¶ 26 ("Defendant began a malicious campaign to paint Plaintiff in a false light in the online streaming community and destroy Plaintiff's reputation.")). This conduct alone was not directed at Illinois and would not

7

create a substantial connection with Illinois other than through Lord himself. *See Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the *defendant's conduct* that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."); *see also Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) ("Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state."). Moreover, as long as Lord's real-world identity was divorced from his online-gaming persona as Ohmwrecker, there was nothing to tie defendant's conduct defaming Ohmwrecker to any state at all, let alone to Illinois specifically.

But critically, Smith also outed Ryan Lord as Ohmwrecker to millions of Smith's followers, and he then published Lord's home address and directed those who saw his posts to threaten Lord. (Dkt. 1 ¶ 138; dkt. 15-1 ¶ 21; dkt. 35 at 6–8).[3] This practice of defamation and harassment in the online community is known as "doxing."[4] By allegedly publishing Lord's home address and encouraging others to take action against him, he expressly aimed his defamatory conduct at Illinois. *See Tamburo v. Dworkin*, 601 F.3d 693, 707–08 (7th Cir. 2010) ("Tortious acts aimed at a target in the forum state and undertaken for the express purpose of causing injury there are sufficient to satisfy *Calder*'s express-aiming requirement [of personal jurisdiction]." (discussing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984))); *see also, e.g.*, *Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 850, 860–61 (E.D. Mich. 2019) (distinguishing between using a

---

[3] Plaintiff provided ex parte an unredacted example of the screenshot on page 7 of his sur-reply. (Dkt. 35 at 7). The message was posted from one of Smith's alleged Twitter handles and shows a screenshot that reveals Lord's name, photograph, Illinois home address, date of birth, and associated websites and social media profile handles, including "Ohmwrecker."

[4] "Doxing, sometimes spelt 'doxxing' or 'd0xing,' involves releasing someone's personal details onto the Internet in an easily accessible form. These details may include full legal names, residential addresses, unique identifiers for governmental records and services (such as social security numbers in the US), business records and documents, and personal photographs of one's self and loved ones. . . . It may be used to humiliate, intimidate, threaten, or punish the identified individual." David M. Douglas, *Doxing: A Conceptual Analysis*, 18 ETHICS INFO. TECH. 199, 199 (2016).

person's online persona in online harassment campaign and disclosing physical address by doxing, which could provoke more immediate response from local residents, and was sufficient to establish "minimum contacts" with the forum state). Smith's conduct fulfills the "express aiming" tests as outlined in both *Calder v. Jones* and *Tamburo v. Dworkin*, and it is also consistent with *Walden*'s defendant-focused analysis.

In *Calder*, the Court had held that Florida-based defendants in a defamation action had "expressly aimed" an article about the plaintiff toward magazine subscribers in California, where she lived and worked and would feel "the brunt of that injury." *Calder*, 465 U.S. at 789–90. Defendants' conduct therefore created sufficient minimum contacts with California that they could expect to be held to account there. *Id.* at 790. Later, the court in *Tamburo v. Dworkin* applied this analysis to online communications. 601 F.3d at 702–03 (discussing *Calder*). In *Tamburo*, the defendants had published false statements on their websites about the plaintiff, sent email blasts encouraging boycotts of the plaintiff's business, and disclosed his Illinois address and urged others to contact and harass him. 601 F.3d 693, 706 (7th Cir. 2010)). This showed defendants had "specifically aimed their tortious conduct at Tamburo and his business in Illinois with the knowledge that he lived, worked, and would suffer the 'brunt of the injury there.'" *Id.* at 706. The defendants had "the express goal of inflicting commercial and reputational harm on [Tamburo] *there* [in Illinois], even though their alleged defamatory and otherwise tortious statements were circulated more diffusely across the internet." *Id.* at 707 (emphasis added). This targeting of the plaintiff within the jurisdiction satisfied *Calder*'s due-process requirements for specific personal jurisdiction. *Id.*

Likewise, here, Smith allegedly disclosed Lord's real-life identity and home address, which he—like most social media professionals with large online followings—had purposely kept

9

private. Although Smith's public posts were accessible from anywhere, by anyone, it is reasonable to infer Smith intended those in Illinois specifically to act in response to his defamatory posts. *See, e.g.*, *Vangheluwe*, 365 F. Supp. 3d at 861 (explaining that a defendant who provides a physical location for the target of harassment intends to cause some action in the forum state or "catch the eye of those most able to make contact with" the plaintiff in that state). He directed his followers directly to Lord's door with that information. (Dkt. 15-1 ¶ 21 ("Defendant has directed his fans to my home address in Illinois and encouraged his fans to contact me and harass me, even when his fans commented on these posts with threats of violence against me.")).

Smith's conduct also satisfies the criteria for personal jurisdiction outlined in *Walden v. Fiore*. *Walden*—decided after *Tamburo*—which further clarified *Calder* and focused the relevant inquiry on the defendant's suit-related conduct directed toward the forum state, rather than toward the plaintiff injured in the forum state. *See Walden*, 571 U.S. at 287–88 ("[T]he reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California . . . [so] defendants' intentional tort actually occurred *in* California."). The Seventh Circuit has since disclaimed any implication that a court has personal jurisdiction over a defendant solely for targeting a plaintiff who happens to reside in the forum state and causing him foreseeable harm there. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014), *as corrected* (May 12, 2014) ("[A]fter *Walden*, there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' Any decision that implies otherwise can no longer be considered authoritative."); *Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018) ("[T]he Court's 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." (internal quotations omitted)).

But here, the analysis is consistent with *Walden* and its progeny. Smith allegedly conducted a broad-based, online defamatory campaign against Lord and then revealed his Illinois address and encouraged his followers to threaten and harass him. He thus 1) targeted Illinois with these statements, and 2) affected Lord's reputation in Illinois specifically. In a defamation claim, the key element is the publication of a false statement to a third party.[5] As *Walden* clarified about *Calder*'s holding, "the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens." *Walden*, 571 U.S. at 287–88. Because the *Calder* plaintiff was an actress whose career depended on her reputation in California, defendants aimed their article at that state, where their magazine had the most subscribers. *Id.* at 286–87.

Likewise, Smith's disclosure tied Lord's professional, online reputation as "Ohmwrecker" to his personal reputation within his local Illinois community. Before this disclosure, Illinois residents and Lord's neighbors would not have known Lord was "Ohmwrecker," as he kept his real name private. (Dkt. 1 ¶ 9). Now, because of Smith's alleged defamation campaign, the name "Ryan Lord" is tied to the handle "Ohmwrecker," along with his Illinois home address and other private details. The posts allege Ohmwrecker had sexual contact with a minor and released revenge porn against her. (Dkt. 1 ¶ 52). It is reasonable to infer Smith intended residents of Lord's local community to believe they were living near a sexual predator. But for Smith's revelation of Ohmwrecker's identity and location, Lord's local reputation would not have been injured. *See Walden*, 571 U.S. at 287–88 (explaining that the crux of *Calder* was the defendants' intention to injure Calder's reputation in the forum state). Smith thus directed his online communications at

---

[5] Under Illinois law, the plaintiff in a defamation claim must show "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009).

Illinois specifically by revealing Ohmwrecker's identity and home address there. *See, e.g.*, *Monco v. Zoltek Corp.*, 342 F. Supp. 3d 829, 834 (N.D. Ill. 2018) ("The Supreme Court in *Walden* made clear that to satisfy this ["express-aiming"] test, the defendant's own allegedly tortious conduct must be directly connected to the forum state itself, and not just to the plaintiff who resides there.").

Furthermore, by posting Lord's address in conjunction with the defamatory campaign, Smith similarly intended Illinois residents to contact Lord to threaten violence against him at his home. *See, e.g.*, *Vangheluwe*, 365 F. Supp. 3d at 860 (finding "it is plausible that [defendant] intended to pique Michiganders' interest with her tweet" by revealing plaintiff's address in Michigan); *Bittman v. Fox*, No. 14 C 8191, 2015 WL 5612061, at *5 (N.D. Ill. Sept. 23, 2015) (distinguishing *Tamburo* where defendants expressly attempted "to incite action by residents of the forum state, against the plaintiff in the forum state" from a situation where defendant merely identified in a blog post a librarian who worked in Illinois). Indeed, one of Smith's followers said "he was contemplating if it was worth going to prison for going after" Lord, suggesting the potential immediacy of the threat. (Dkt. 1 ¶ 140). If Smith had intended only to injure Ohmwrecker's online reputation as a video game streamer, there would have been no need to identify his physical location. But here, Smith indicated a specific, intentional geographic focus for his posts, tying the alleged defamation campaign to Illinois and its residents and not solely to Lord's online persona as Ohmwrecker. *See Advanced Tactical*, 751 F.3d at 803 (requiring evidence that defendant had targeted residents of a specific state in some way).

Having satisfied the first test of specific personal jurisdiction—Smith purposely directed his activities at Illinois and its residents—the next step in the analysis is to determine whether Lord's injury arose out of Smith's forum-related activities. The Seventh Circuit has not indicated whether, in the context of an intentional tort, a defendant's forum-related activities must be the

12

but-for cause or only the legal cause of plaintiff's injury. *See Tamburo*, 601 F.3d at 708–09 (discussing various circuits' approach to issue and declining to adopt any circuit's approach); *see also Felland*, 682 F.3d at 677 (declining again to adopt specific test but holding "tortious misrepresentations expressly aimed at [the forum state] for the purpose of causing injury there sufficient"). But as in *Tamburo*, "[u]nder even the most rigorous approach to the determination of whether the plaintiff's injury 'arises out of' the defendant's contacts with the forum state," Lord's injury here does. 601 F.3d at 709. Lord did receive threats against his physical safety at home. (Dkt. 1 ¶¶ 69, 139; dkt. 15-1 ¶ 22). He also received threats of violence toward his dog and girlfriend—whose identity was also revealed. (Dkt. 1 ¶¶ 69, 139; dkt. 15-1 ¶ 22; dkt. 35 at 8–9). The threats were allegedly serious enough for Lord to file reports with the Elgin Police Department and an IC3 report with the Chicago FBI field office. (Dkt. 35 at 9).

Although doxing itself is not necessarily defamation, the combination of defamatory statements involving sexual misconduct with minors and revealing Lord's identity and home address produced the injury associated with defamation: humiliation and loss of reputation within the local community. Moreover, Lord has included a claim for intentional infliction of emotional distress, which is directly tied to the fear he experienced that someone would have both the means and motivation to carry out such threats because of these posts. *See, e.g.*, *Vangheluwe*, 365 F. Supp. 3d at 361–61 (noting that Court could exercise pendent personal jurisdiction over defamation and false-light claims based on IIED claim arising from doxing). Lord's injuries thus arose out of Smith's forum-related activities—defamatory posts aimed at Illinois residents, causing Lord to fear for his safety because of allegations he was a sexual predator.

The final step in the analysis asks whether requiring Smith to defend in Illinois would comport with "traditional conceptions of fair play and substantial justice." *Burger King*, 471 U.S.

13

at 464. The court considers the following relevant factors: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 464). Where the first two requirements for exercising jurisdiction are met, the defendant seeking to defeat jurisdiction "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Burger King*, 471 U.S. at 464).

Neither Smith nor Lord has addressed these factors in detail, as their arguments focused—understandably—on the purposeful direction of Smith's activities. Considering the information available to the Court, it would not be unreasonable for Smith to defend himself in Chicago, where this Court sits. As has often been noted in similar disputes, "Illinois has a strong interest in providing a forum for its residents . . . to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Tamburo*, 601 F.3d at 709. Smith would bear some burden in being forced to defend himself in Illinois, "but out-of-state defendants *always* face such a burden," and his is not "any greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents." *Felland*, 682 F.3d at 677. This burden, however, is considerably lessened by the availability of virtual status hearings and remote discovery techniques.

The third factor—the plaintiff's interest in obtaining convenient and effective relief—weighs slightly in favor of Illinois, where Lord and several of the witnesses reside.[6] The final two

---

[6] Both Lord and Smith name their respective partners as prospective witnesses who would testify as to the relevant events. But Lord also identified in his sur-reply his former girlfriend, Malgorzata Choragwicka, as the formerly underaged sexual partner that several of the alleged defamatory statements involve, and who is an Illinois resident. (Dkt. 35 at 4–5). Lord also identified the police departments that he reported the online threats to. (Dkt. 35 at 9). He further intends to call George Depree, an Illinois resident and CEO and co-founder of Leviathan Core, LLC, a business that stopped sponsoring Lord due to the defamation. (Dkt. 35 at 11 n.6).

14

factors are neutral: efficient resolution of this matter can be achieved in Illinois just as easily as in any other forum. And in ordinary tort litigation such as this, there is nothing to advance the "shared interests of the several States in furthering fundamental substantive social policies." *Majumdar v. Fair*, 567 F. Supp. 3d 901, 915 (N.D. Ill. 2021) (citing *Abad v. Bayer Corp.*, 563 F.3d 663, 668 (7th Cir. 2009)). Given these factors, it is not unreasonable for Smith to defend himself in Illinois.

In sum, Smith's suit-related conduct created a substantial relationship with Illinois. Because Lord has shown sufficient minimum contacts between Smith and Illinois, it would not "offend traditional notions of fair play and substantial justice" for this Court to exercise personal jurisdiction over Smith. *Int'l Shoe Co.*, 326 U.S. at 316. The Court denies Smith's Motion to Dismiss for lack of personal jurisdiction. (Dkt. 7).

**B.     Venue**

    **1.  Motion to Dismiss for Improper Venue**

Venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). "District courts have a substantial amount of discretion in determining venue, which is an inquiry focused on fairness and convenience of the parties as opposed to constitutional considerations." *Dutch Valley Growers, Inc. v. Rietveld*, 314 F.R.D. 293, 295 (N.D. Ill. 2016) (quoting *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866–67 (N.D. Ill. 2009)). When challenged, the plaintiff bears the burden of proving venue is proper. *Id.*; *see also, e.g.*, *Estate of Moore v.*

*Dixon*, 460 F. Supp. 2d 931, 935 (E.D. Wis. 2006); *Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003).

Smith argues Lord cannot show proper venue under § 1391(b)(2), because he cannot show "a substantial part of the events or omissions giving rise to" Lord's claims occurred in the Northern District of Illinois. (Dkt. 8 at 8–9; dkt. 16 at 11). Courts in this district have found that § 1391(b)(2) can be "satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action." *Interlease Aviation Investors II (Aloha) L.L.C.*, 262 F. Supp. 2d at 913.

Here, a substantial part of the communications at issue in the litigation were transmitted to the Northern District of Illinois—namely, the death threats and other threats of violence Lord received because of the alleged defamation. (Dkt. 1 ¶ 69, 139; dkt. 15-1 ¶ 21–22). Smith also allegedly contacted Lord's ex-girlfriend, Malgorzata Choragwicka, a resident of Kane County, Illinois, at the time of the outreach. (Dkt. 35 at 4–6; dkt. 15-1 ¶ 15; dkt. 35-2 at 2–3). Lord further alleges that Smith directly sent him messages with insults and other distressing statements. (Dkt. 15-1 ¶ 14). In the context of this litigation, these communications show a substantial part of the events that gave rise to Lord's claims occurred in the Northern District of Illinois.

Finally, even if these contacts were insufficient to constitute "a substantial part of the events or omissions giving rise to" this suit, Lord would find recourse in § 1391(b)(3). As discussed above, this Court has personal jurisdiction over Smith in this action. Smith's motion to dismiss for improper venue is denied. (Dkt. 7).

### 2. Motion to Transfer to the Eastern District of North Carolina

In the alternative, Smith argues that this action should be transferred to the Eastern District of North Carolina. The relevant statute provides: "For the convenience of parties and witnesses, in

16

the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). The court "must evaluate both the convenience of the parties and the various public-interest considerations." *In re Ryze Claims Solutions, LLC*, 968 F.3d 701, 707–08 (7th Cir. 2020) (quoting *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for the Western District of Tex.*, 571 U.S. 49, 62 & n.6 (2013)). "In determining whether the transfer would be in the 'interest of justice,' a court may consider several factors, including 'docket congestion and likely speed to trial in the transferor and potential transferee forums,' 'each court's relative familiarity with the relevant law,' 'the respective desirability of resolving controversies in each locale,' and 'the relationship of each community to the controversy.'" *Id.* at 708 (quoting *Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010)).

Starting the analysis with the convenience of the parties, "courts generally consider the availability of and access to witnesses, and each party's access to and distance from resources in each forum. . . . Other related factors include the location of material events and the relative ease of access to sources of proof." *Rsch. Automation, Inc. v. Schrader-Bridgeport Intern'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted). Here, the parties have each suggested their respective partners—who live in their same respective districts—will be a relevant fact witness regarding the underlying events and their aftermath. Smith has suggested that at least one of Lord's sponsors—Epic Games—is a North Carolina company, and company employees would testify as to any loss of reputation within Lord's professional community. (*See* dkt. 16 at 13). Lord, for his part, suggests the CEO of an Illinois company, Leviathan Core, LLC, would be called as a witness regarding damage to his professional reputation. (Dkt. 35 at 11 n.6). And, perhaps most

17

critically to this defamation case—where truth is a complete defense to defamatory statements[7]—Lord's former girlfriend, Malgorzata Choragwicka, resides in the Northern District of Illinois. (*See* dkt. 35-2 at 2–3). As many of the allegedly defamatory posts concerned her involvement with Lord, she will likely be an important witness. Other than the witnesses themselves, it appears the relative ease of access to sources of proof is the same regardless of venue. The communications at issue here all exist online. *See, e.g.*, *Basile v. Prometheus Global Media, LLC*, No. 15-cv-10138, 2016 WL 2987004, at *6 (N.D. Ill. May 24, 2016 ("[I]n this age of electronic document transmission, the parties and the Court can easily access any necessary documents in Chicago just as well as in the [proposed alternative venue]."). Weighing the relative convenience to the critical witnesses, then, tips the balance in favor of Lord.

Moving to the public interest factors, the Court finds no compelling reason to disturb the plaintiff's choice of venue. Comparing the relative length of time to trial in each venue, Smith states only "docket congestion is, at the very most, neutral." (Dkt. 8 at 14). Lord, on the other hand, shows the average length of time to resolve a civil case in the Northern District of Illinois is about 7.2 months, whereas it takes 11.6 months in the Eastern District of North Carolina. (Dkt. 35 at 12 (citing https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0630.2022_0.pdf)). Furthermore, Lord has filed Illinois state law claims; a court in Illinois will be more familiar with applying Illinois law than a court in North Carolina. Finally, it is not more desirable to resolve this controversy in North Carolina, for the same reason that the Illinois community has a closer relationship to this controversy. The claims involve the alleged injury to a plaintiff in Illinois arising out of defendant's activities directed at the forum state. "Illinois has a strong interest in providing a forum for its residents . . . to seek redress for tort injuries suffered within the state and

---

[7] *See Tirio v. Dalton*, 144 N.E.3d 1261, 1278 (Ill. App. 2d 2019) ("A defendant is not liable for a defamatory statement if the statement is true.").

inflicted by out-of-state actors." *Tamburo*, 601 F.3d at 709. The public-interest factors, therefore, do not weigh in favor of transfer.

The Court denies Smith's Motion to Transfer Venue to the Eastern District of North Carolina.

## CONCLUSION

The Court denies Smith's Motion to Dismiss for lack of personal jurisdiction and improper venue [7]. The Court also denies the Motion to Transfer Venue to the Eastern District of North Carolina. [7]

_____
Virginia M. Kendall
United States District Judge

Date: December 14, 2022